# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

SETH TAYLOR, )
)
   Plaintiff, )
)
v. )   **Case No. 3:16-cv-03257**
)   **Judge Aleta A. Trauger**
DAVIDSON COUNTY SHERIFF'S )
OFFICE, DWAYNE BUTLER JAMES )
LEMASTER, JACOB STEEN, JACOB )
VOYLES, AND JONATHAN )
RODGERS, )
)
   Defendants. )

## MEMORANDUM

Before the court is the Motion for Summary Judgment filed by defendants Dwayne Butler, Jacob Steen, Jacob Voyles, and James LeMaster. (Doc. No. 34.) For the reasons set forth herein, the motion will be granted in part and denied in part.

## I.   PROCEDURAL HISTORY

The claims in this case arise from an incident that took place on August 25, 2016, while the plaintiff, Seth Taylor, was detained at the Davidson County Male Correctional Development Center ("CDM"), a facility operated by the Davidson County Sheriff's Office ("DCSO"), for a probation violation. Taylor filed a *pro se* form Complaint on December 14, 2016, claiming that the individual defendants, all officers at the CDM, used excessive force against him without reasonable cause in violation of his constitutional rights. (Doc. No. 1.) On January 4, 2017, then Chief Judge Kevin Sharp dismissed the DCSO as a defendant and referred the action to Magistrate Judge Joe B. Brown under 28 U.S.C. § 636(b)(1)(A) and (B). (Doc. Nos. 4, 5.)

In September 2017, the remaining defendants filed their Motion for Summary Judgment

under Rule 56 of the Federal Rules of Civil Procedure, supporting Memorandum of Law, Statement of Undisputed Facts, and several Declarations and other evidentiary material. (Doc. Nos. 34–41.) In support of their motion, the defendants argued that (1) they are entitled to qualified immunity; and (2) the defendant failed to exhaust his administrative remedies, as required by the Prison Litigation Reform Act ("PLRA"), 42 U.S.C. ¶ 1997e(a). Immediately following the filing of the Motion for Summary Judgment, Magistrate Judge Brown ordered the defendants to file a copy of any existing video recording of the cell extraction that gave rise to the plaintiff's claims and to make provisions for the plaintiff to review it. (Doc. No. 42.) The defendants did so promptly, without objection. (Doc. No. 44.) The plaintiff then filed a response opposing the Motion for Summary Judgment (denominated "Motion to Deny Summary Judgment") (Doc. No. 46), but he did not file a response to the Statement of Undisputed Facts. Magistrate Judge Brown issued a Report and Recommendation ("R&R") on August 2, 2018, recommending that the court grant the defendants' motion solely on the grounds that the plaintiff had failed to exhaust administrative remedies prior to filing suit. (Doc. No. 52.) The plaintiff filed objections (styled as a "Motion to Deny Defendant's Summary Judgment"). (Doc. No. 53.)

By that time, Judge Sharp had resigned from the bench, and, due to a shortage of judges in this district, the matter had been transferred to the Honorable Linda V. Parker, United States District Judge for the Eastern District of Michigan, sitting by designation. Following the issuance of the R&R, Judge Parker entered an Order directing the defendants to "file copies of the grievances Plaintiff filed in relation to the relevant incident." (Doc. No. 54.) The defendants filed two computer-generated Inmate Grievance Reports that referred to grievances the plaintiff had submitted on September 2 and November 22, 2016. The Reports restated verbatim the text of the original grievances but also purported to show the DCSO's response and the status of the

grievances. (Doc. Nos. 55-1, 55-2.)

On February 12, 2019, Judge Parker entered a Memorandum and Order granting the Motion for Summary Judgment as to defendant Jonathan Rodgers, as there was no evidence in the record that he was personally involved in the use of excessive force, but denying the motion as to the other defendants on the basis that material factual disputes existed as to whether the plaintiff had exhausted administrative remedies and that the defendants had not established entitlement to qualified immunity. (Doc. Nos. 57, 58.)

The defendants thereafter filed a Rule 60 Motion for Relief from Judgment and supporting Memorandum (Doc. Nos. 61, 62), along with copies of over one hundred pages of handwritten grievances submitted by the plaintiff during his detention by the DCSO. The defendants argued that these grievances, together with other evidence in the record, conclusively demonstrated that DCSO's grievance procedures provided an avenue for appeal that the plaintiff did not take and, therefore, that he failed to properly exhaust his administrative remedies as required by the PLRA. Judge Parker appointed counsel for the plaintiff at this point, and appointed counsel filed a Response in opposition to the Motion for Relief from Judgment along with additional evidentiary material. (Doc. Nos. 73–75.) Judge Parker ultimately denied the defendants' motion, finding a material factual dispute as to exhaustion. (Doc. No. 79.)

The defendants pursued an immediate appeal based on the denial of qualified immunity. On October 26, 2020, the Sixth Circuit issued an opinion dismissing, for lack of jurisdiction, that portion of the appeal devoted to the exhaustion issue but going on to find that the district court had erred in denying qualified immunity without conducting an individualized analysis of each officer's liability. *Taylor v. Davidson Cty. Sheriff's Dep't*, No. 19-5627 (6th Cir. Oct. 26, 2020) (Doc. No. 84.) The appellate court therefore vacated the order denying summary judgment and

remanded the case for further proceedings. *Id.* at 9.[1]

Following remand, Magistrate Judge Barbara Holmes[2] conducted a case management conference and issued a new scheduling order, permitting discovery and supplemental briefing on the qualified immunity issue. The plaintiff, through appointed counsel, thereafter filed a Supplemental Memorandum of Law, Statement of Additional Disputed Material Facts, and supporting evidentiary material.[3] (Doc. Nos. 93–95.) The defendants filed a Response, along with their own supporting evidentiary materials. (Doc. Nos. 99 and attached exhibits.) The plaintiff filed a Reply, and the defendants filed a Surreply. (Doc. Nos. 101, 103.)

On May 8, 2022, the case was reassigned to the undersigned.

## II.    FACTS RELEVANT TO THE QUALIFIED IMMUNITY ANALYSIS

By way of background, and as set forth in the Sixth Circuit's remand opinion, it is undisputed that plaintiff Seth Taylor was serving a six-month term of incarceration for a probation violation at the CDM. While there, he made comments to his mother that caused her to become concerned for his mental health, and those concerns were related to medical staff at the CDM. The medical staff ordered Taylor to speak with a mental health professional or, alternatively, be transported to a safe room. Defendant Jacob Steen asked Taylor whether he would speak with a mental health professional; Taylor refused.

---

[1] No appeal was taken of that portion of Judge Parker's Order granting summary judgment in favor of defendant Jonathan Rodgers, so the Sixth Circuit's vacatur and remand did not affect that ruling.

[2] Magistrate Judge Brown having retired, the matter was reassigned to Magistrate Judge Holmes in February 2020. (Doc. No. 83.)

[3] The court commends appointed counsel on an excellent job in representing the plaintiff in this case.

Steen, in fact, testified that he spoke with Taylor five times. The first two times, he asked Taylor to speak to the mental health counselor. The third time, he told Taylor that, if he refused the option of speaking with a mental health counselor, he would be scheduled for transfer to the safe room. Taylor responded, "Fine, send me to the safe room then." (Doc. No. 99-1, Steen Dep. 66.) Once the housing transfer was scheduled, Steen went back to the housing unit, approached Taylor, and told him he needed to pack up his stuff for the move to the safe room. Taylor continued to refuse, so Steen went back a fifth time, on this occasion with Officer Rodgers to assist him, thinking "maybe he can gain some compliance." (*Id.* at 71.)

Taylor continued to refuse to go to the safe room voluntarily, so, at that point, Steen reported the situation to Lieutenant Dwayne Butler, also a defendant in this case. (*Id.* at 72–75.) Butler assembled an "extraction team" to transport Taylor to the safe room. The extraction team consisted of Butler and Steen, as well as officers Jacob Voyles, James LeMaster, and Jonathan Rodgers.[4] The extraction team went to Taylor's housing unit for the purpose of transporting Taylor to the safe room. At this juncture, the facts become slightly murkier.

As the audio-video recording of the event reflects, the extraction team approached Taylor as he was lying on his lower bunk in a large housing unit.[5] and Lt. Butler said to him: "Mr. Taylor, we need you to get up so you can go off to the safe room." Butler flipped the blanket off Taylor and ordered him at least four times to stand up. Taylor did not comply. Between 16 and 18 seconds into the encounter, Butler gave Taylor a "last warning" to get up. At 25 seconds, Taylor finally sat up in his bunk and placed his feet on the floor, but he remained sitting, with his hands on his knees.

---

[4] Rodgers's only role was to operate the video camera.

[5] The defendants testified that the CDM has 64-man dormitory-style housing units. (Doc. No. 99-2, Butler Dep. 74; Doc. No. 94-3, LeMaster Dep. 24.) In the video, numerous other inmates can be seen milling around and watching while the officers were removing Taylor from the housing unit.

Butler ordered him to turn around and asked him again if he was going to stand up. Around 32 seconds into the encounter, one of the officers asked Taylor if he was going to get up, and someone told him again, "We're going to transfer you to the safe room."

At this juncture, the camera's view was blocked by the bunk for several seconds, and it was apparently during time that LeMaster deployed chemical spray toward Taylor's face. It does not appear that the officers provided Taylor with any additional warning before he was sprayed. Even after being sprayed, Taylor remained seated on his bunk. At around 40 seconds, the officers told Taylor to get on the ground. They grabbed him by the arms and began trying to handcuff him. Taylor resisted, and the officers began wrestling with him, first on the bunk, until one of his hands was secured, at which point they moved him to the floor. It took the officers more than a minute from the time the struggle began to secure both of Taylor's hands, and another 25 seconds before both feet were secured. Once Taylor was secured, the officers carried him out of the room, while he was face down and in restraints. Once he was removed from the housing unit, the officers called for medical assistance for "decontamination of spray." The video recording ends at 3:49.

Taylor claims that the officers used excessive force by (1) unnecessarily deploying chemical spray, (2) choking him until he was unconscious, and (3) carrying him roughly,  causing a reinjury of his back and tissue damage to his left wrist and hand. (Doc. No. 1, at 5.) The plaintiff alleges that defendant LeMaster placed him in what the plaintiff calls a "calculated chokehold" and told him "I'm going to break your fucking neck." (Doc. No. 94-8, Taylor Dep. 28.) He claims that LeMaster placed so much pressure on his neck that he blacked out for a short time. (*Id.* at 29.) Taylor insists that the injury to his left hand and wrist resulted from the defendants' picking him up "by [his] chains and just dragging [him] like a rag doll," instead of "picking [him] up by [his]

arms . . . carrying [him] the correct way." (*Id.*) Review of the video, however, establishes that the defendants carried Taylor by his limbs and not by the leg irons or handcuffs.

In the plaintiff's Statement of Additional Material and Undisputed Facts, the plaintiff points to the DCSO's Use of Force Policy, which "provide[s] guidelines for appropriate use of force by [DCSO] personnel." (*See* Doc. No. 94-1, at 2.) The defendants admit to the existence of the Use of Force Policy and that it says what it says, but they deny that the Use of Force Policy is either material to the issue of qualified immunity or to calculated uses of force, such as that used in this case in order to transport Taylor to the safe room against his will.

The Use of Force Policy defines "Force" to include "use of a chemical agent, application of subject control techniques, and taking a person to the ground," as well as "handcuffing an actively resistant inmate." (Doc. No. 94-1, at 2.) It defines the term "Calculated Use of Force" as the "[u]se of force when a subject's behavior, past or present, presents a foreseeable need for the use of force, or when compliance is necessary but the subject is isolated and presents no immediate direct threat to others." (Doc. No. 94-1, at 2.) A Calculated Use of Force is distinguished from an "Immediate Use of Force," defined as the force used "when a subject's behavior constitutes an immediate, serious threat to the inmate, staff, others, or property, or to institutional security and good order." (*Id.*)

The Use of Force Procedural Guidelines provide that

Personnel ordinarily attempt to gain the subject's voluntary cooperation before using force. When force is needed, personnel, based on training and experience, determine which level of response will best de-escalate the situation in a safe and objectively reasonable manner. Physical force is used only when there is no reasonable alternative and in accordance with appropriate statutory authority.

(*Id.* at 3.) Among other instances, "[p]hysical force may be used to . . . enforce institutional rules," but it may never be used as a form of punishment. (*Id.*) "The term 'objective reasonableness' is

used to describe the process for evaluating the appropriateness of an officer's response to a subject's resistance and/or non-compliance." (*Id.*)

A non-exhaustive list of factors relevant to a determination of whether the use of force is reasonable includes, among other factors, the "officer's perceptions" of the circumstances, the "amount of force used in relation to the need for force," the "efforts made to limit the severity of the force used," and "[w]hether the inmate was actively resisting." (*Id.* at 4.) The Use of Force Policy provides a "Use of Force Model" that sets out "guidance for the type and degree of force that can reasonably be used to influence an individual to do what the officer wants him to do." (*Id.* at 5.) As the Policy explains, the model's "tiers show the different levels of threat and possible responses." The model describes "five levels of perceived behavior": compliance, passive resistance, active resistance, assaultive/bodily harm, and deadly threat. (*Id.* at 5–6.) It also describes five levels of response:

- Cooperative controls – Use of routine supervision and communication skills to gain the individual's acceptance of authority. Simply asking an individual to do something involves the use of cooperative controls.

- Containment techniques – The purpose is to stabilize and prevent escalation of an encounter. Contact is made with the individual, usually verbally, although it may be written. Giving a direct order to an individual is an example of the use of a containment technique. Warnings, informal resolution of disciplinary issues, and incident reports are other examples.

- Compliance techniques – Stabilization of an incident. At this point assistance is needed. It is not a situation the officer should attempt to handle by himself. The confrontational avoidance process or a show of force by bringing in additional officers is an example of the use of compliance techniques.

- Controlling/defensive tactics – Steps must be taken for self-preservation of protection of other employees. The use of chemical agents, a forced cell move, and the use of subject control techniques are examples of controlling/defensive tactics.

- Deadly force – Absolute and immediate tactics that must be deployed to stop a lethal threat. Use of a firearm is an example of the application of lethal force.

(*Id.* at 6.)

These response tiers correspond with the "levels" of enforcement electives, also described in the Policy:

- Level I – Basic communication and operation skills and techniques that are normally effective with cooperating individuals.

- Level II – Individuals are controlled through the use of certain words, tone of voice, and body language.

- Level III – At this level, individuals are controlled through a request for additional officers, or a show of force.

- Level IV – Personal defense tools, chemical agents, impact weapons, and various team tactics may be appropriate at this level.

- Level V – Firearms may be used.

(*Id.*) The use of chemical agents is the "primary option" for "responding to level IV behavior." (*Id.* at 7.) After any use of chemical spray, the officer involved must contact medical personnel and ensure that any person exposed to a chemical agent is seen by medical personnel for "decontamination and appropriate medical treatment. (*Id.* at 8.)

With a Calculated Use of Force, "[t]he officer notifies the immediate supervisor prior to a calculated use of force, and determines whether the situation can be resolved using the confrontation avoidance process. Personnel use a hand-held video device to record calculated uses of force." (*Id.* at 7.)

Because a consideration of each officer's entitlement to qualified immunity requires careful consideration of each officer's role in the process, the court will endeavor to parse the facts available regarding each officer's actions.

*Officer Steen*

Officer Steen was the person who had several conversations with Taylor to try to persuade him, first, to talk with the mental health provider and, later, to go voluntarily to the safe room,

since he refused to speak with a mental health counselor. Steen notified Butler of the situation, which prompted Butler to assemble the extraction team.

During the extraction, Steen can be seen on the video as the officer struggling to gain control of Taylor's legs while Officer Voyles handcuffed him. Taylor and all four officers were on the bunk until Taylor's left hand was secured. While they were still on the bunk, Steen likely could have seen that LeMaster had Taylor in a neck restraint. Once one of Taylor's hands was secured, the officers moved him to the floor. At that point, Steen continued to hold Taylor's legs while Voyles placed leg irons on Taylor's ankles. Steen would not have been able to see what LeMaster was doing, as his view would have been blocked entirely by both Butler and Voyles, as well as by LeMaster himself. After Taylor was secured, Steen assisted in transporting him by carrying his right leg, at the ankle.

Steen testified that he recalled that he was "near [Taylor's] legs so [he] gained leg control." (Doc. No. 94-4, Steen Dep. 85.) He did not actually recall that LeMaster had applied a neck restraint, but he knew from having watched the video that he had done so. He did not at any point tell LeMaster to stop using a neck restraint. (*Id.*)

Steen testified that he was familiar with the term "neck restraint" and that it generally meant a "hand-to-hand control of another person's head or neck movement." (*Id.* at 13.) He agreed that the use of a neck restraint can cause injury and even death in some circumstances. (*Id.* at 14.) He also testified, regarding the Use of Force Policy, that he understood an inmate's "merely refusing to comply with a directive" constituted active resistance sufficient to justify the use of a chemical spray. (*Id.* at 25.) He testified that an inmate's active noncompliance with a direct command could justify the use of a neck restraint in some situations. (*Id.* at 28–29.)

*Officer Voyles*

Officer Voyles testified that it was good practice generally to try to warn an inmate about the consequences of noncompliance with a directive—for instance, by telling him that chemical spray and/or physical restraint would be used if he did not comply. (Doc. No. 94-5, Voyles Dep. 15, 37.) Voyles also agreed that the use of a neck restraint could result in injury to an inmate and that, although neck restraints were authorized in 2016, they were no longer authorized under DCSO policy at the time of his deposition. (*Id.* at 25, 27.)

Regarding his recollection of the extraction, Voyles stated that Lt. Butler assembled the team and told them that Taylor was to be moved for mental health reasons and that he was "a Level II," meaning that he was considered suicidal. (*Id.* at 68.) Voyles testified that, during the extraction, it appeared that LeMaster was unable to gain control of Taylor's right arm, so he transitioned to a neck restraint. (*Id.* at 77.) He did not hear LeMaster tell Taylor he would "break [his] fucking neck." (*Id.* at 79.) He affirmed that he would have had a duty to intervene, and would have intervened, if he had heard an officer make a threat like that. (*Id.* at 80.) Voyles never told LeMaster to remove the neck restraint. Voyles agreed that Taylor never made physical or verbal threats toward the officers, nor did he engage in assaultive behavior or the use of weapons. (*Id.* at 93.) However, according to Voyles, Taylor was actively resisting by refusing directives to get up and turn around. (*Id.*)

The video shows that Voyles was facing toward Taylor's head while putting handcuffs on him. Voyles explained that he was trying to gain control of Taylor's left arm, which attempt Taylor was resisting by holding it against his body. (*Id.* at 97.) Based on the video, it appears that Voyles would have been able to see that LeMaster had Taylor in a neck restraint. Once the officers moved Taylor to the floor, in a prone position, Voyles is the officer in the middle of the frame with one

leg over Taylor's body. He finished restraining the left arm with a handcuff and then asked for Taylor's right arm to be placed behind his back. (*Id.* at 98.) According to Voyles, Taylor was still actively resisting at this point, by "[t]rying to pull himself away from being restrained, tensing his body to a point where it's making it difficult for him to be restrained." (*Id.* at 98–99.) Voyles's view of LeMaster, at Taylor's head, was blocked by Butler and by LeMaster, but, "as far as [Voyles] knew," LeMaster was still holding Taylor in a neck restraint. (*Id.* at 98.) After Voyles placed handcuffs and leg irons on Taylor, Taylor was "completely restrained" and de-escalation of the use of force was called for. (*Id.* at 101.) According to Voyles, this de-escalation occurred: LeMaster removed the neck restraint, and Voyles moved from his position on top of Taylor to await further instructions from Butler (*Id.* at 101–02.) He testified that they picked up Taylor and carried him, rather than letting him try to walk on his own, because Butler directed them to do so. (*Id.* at 102.) Voyles stated that he understood that they carried him out of the housing unit "due to the arrestee's resistance level and the fact that we were in an open bay pod with four officers who just used a chemical agent." (*Id.* at 102–03; *see id.* at 84.) Voyles assisted in transporting Taylor by carrying his left leg, above the knee. He testified that it did not appear to him that Taylor at any point lost consciousness. (*Id.* at 109.)

### Officer LeMaster

LeMaster described a neck restraint as placing "pressure on the sides of the neck" rather than on the windpipe. (Doc. No. 94-3, LeMaster Dep. 50.) The purpose of a neck restraint is to "[a]ttempt[] to gain compliance from an assaultive or aggressive inmate." (*Id.*) He agreed that it was possible to render an inmate unconscious by using a neck restraint and that the use of a neck restraint should cease once an inmate is restrained. (*Id.* at 53.)

LeMaster expressed little specific recollection of the August 25, 2016 incident involving Taylor. (*Id.* at 57.) He recalled that Lt. Butler assembled the extraction team, told them that the inmate was "Level II," meaning suicidal, and needed to be escorted to the safe room. Because the inmate was refusing to go, they were to go in and take him to the safe room. (*Id.* at 58, 59.) Before they went into the housing unit, Lt. Butler gave them assignments on what to do if Taylor continued to refuse directives. (*Id.* at 60.) LeMaster testified that his assignment was to deploy chemical spray and apply leg restraints. (*Id.* at 61.) He stated that his understanding was that Taylor was being "actively resistant" by not complying with directives, and he distinguished the situation requiring the calculated use of force from one involving an "immediate threat situation." (*Id.* at 64.)

LeMaster applied a burst of chemical spray to Taylor's face at some point during the encounter. (*Id.* at 65.) He agreed that, before that, Taylor had not engaged in assaultive or aggressive behavior, and LeMaster did not recall that Taylor had made any physical or verbal threats to the officers. (*Id.* at 66.) He characterized Taylor's conduct as "actively resisting" rather than assaultive, prior to the application of the chemical spray. (*Id.* at 67.) He applied the spray because he was directed to do so by Butler. (*Id.* at 69.) He did not recall whether he or Butler gave Taylor any warning before applying the spray. (*Id.* at 70.) LeMaster testified that the use of spray was warranted, because Taylor "was not complying. . . . [W]e had several other inmates in the unit. He was unwilling to comply and, therefore, we were tying to, for his safety, get him out and get him to the holding cell so we could get him to the safe room." (*Id.* at 72–73.)

LeMaster testified as follows regarding how he ended up holding Taylor in a neck restraint rather than gaining control of his feet:

> I attempted to assist [Taylor] to his feet. He resisted and [I] ended up having a head control. . . .

> While we were trying to restrain him, he tried to pull away. . . .
>
> I gained head control and then he ended up – he was on top of me on the bunk, and he continued to resist the other officers, and we ended up going onto the ground.

(*Id.* at 74–75.) Asked why he applied the neck restraint, he explained that Taylor started resisting and "it just . . . happened, like, in the middle of the situation." (*Id.* at 77.) The video reflects that LeMaster was basically pinned under Taylor on the bunk, with his right arm under Taylor's right armpit and his left arm around his neck, with his hands clasped together. He did not release the neck restraint until after they were on the ground and Taylor was fully restrained. In response to the question of whether, at any point during the encounter, he told Taylor he would "break his fucking neck," LeMaster stated "I don't believe so." (*Id.* at 108.) LeMaster cannot be heard to say anything to Taylor on the videorecording, but the recording also does not affirmatively negate the possibility that he said something directly to Taylor that was not picked up. LeMaster stated that, to his knowledge, Taylor did not lose consciousness at any point. (*Id.*)

Once the handcuffs and leg irons were secured, LeMaster stood up, and he assisted in carrying Taylor by carrying his right arm and right shoulder. The view of LeMaster on the video at that point is largely blocked by the other officers, but there is no indication that he carried Taylor by his handcuffs or wrists. LeMaster testified that Butler directed them to carry Taylor. He testified that he carried Taylor's right arm. (*Id.* at 96.)

*Lieutenant Butler*

Lt. Dwayne Butler testified, in relevant part, that he was familiar with the DCSO Use of Force Policy in effect in August 2016. (Doc. No. 94-2, Butler Dep. 13.) He agreed that it was important for officers to tell inmates the consequence of not complying with a directive. (*Id.* at 29.) He stated that neck restraints were considered an appropriate use of force at the time but that,

if he observed that an inmate placed in a neck restraint had lost consciousness and the inmate was no longer combative, he would instruct the officer to release the neck restraint. (*Id.* at 30.)

Regarding the August 25, 2016 event, Butler recalled that an officer on the unit had reported to him that he had been instructed by medical that "Inmate Taylor had to go to the safe room [because he was suicidal]. The officer said he had told Taylor several times to prepare to go to [the] safe room, get up and go to safe room." (*Id.* at 87.) Butler recalled that Taylor had "told him no, he wasn't going, refused to comply, he wouldn't get up." (*Id.* at 91.) Consequently, Butler put together an extraction team to take Taylor to the safe room. (*Id.* at 86.)

The officers on the extraction team—Voyles, Steen, LeMaster, and Rodgers—were in Butler's chain of command, meaning their ranks were lower than Butler's. (*Id.* at 89.) Butler developed a plan to remove Taylor from the housing unit, but, as he stated, "[p]lans don't always go as planned." (*Id.* at 88.) The plan, basically, was to "go in, inform the inmate that he needs to get up to go to the holding cell . . . to go to the safe room. If he fails to comply at that time, we will utilize force to get him up and go to the holding cell." (*Id.*) Butler briefed the officers on the plan and told them that, if the inmate failed to comply with instructions, he would be sprayed and then removed from the housing unit. Asked during his deposition whether he had considered other options, such as just accepting the inmate's "no" for an answer, Butler responded: "once he's been instructed, there's no other options." (*Id.* at 90.) This was the case even though, to Butler's knowledge, Taylor had never made physical or verbal threats to any officers and did not have a history of assaultive behavior. (*Id.* at 92–93.)

Butler described Taylor's conduct when the extraction team approached him and when Butler instructed him to get up as "noncompliant." (*Id.* at 94.) He acknowledged that he had instructed the officers prior to going into the dormitory that, if the inmate failed to comply, he

would be sprayed. (*Id.* at 95.) He did not specifically recall instructing LeMaster to deploy the spray but was "pretty sure" that he did, because LeMaster likely would not have done so otherwise. (*Id.* at 96.) Butler's "standard practice" would have been to tell an inmate that, if he did not comply, spray would be used, but he did not recall whether they had done so with Taylor. (*Id.* at 98.) The purpose of providing such a warning would be to attempt to gain compliance without having to resort to the use of force. (*Id.* at 99.)

According to Butler, even after the spray was applied, Taylor refused to stand up to be cuffed. As a result, the officers moved in to physically gain control of Taylor and put cuffs on him. Butler did not recall one of the officers using a neck restraint and did not order the use of a neck restraint. (*Id.* at 101.) The video shows that Butler assisted in restraining the plaintiff while Voyles applied handcuffs and then leg irons. It appears from the video that Butler would have been able to see that LeMaster had applied a neck restraint for part of the time that the group was holding Taylor on his bunk. Once Taylor was moved to the floor, Butler had his back to LeMaster and was focused on helping Voyles apply the handcuffs.

Butler stated that, "during a physical altercation, it's up to the officer's perception on what type of force he or she needs to use. . . . [W]hoever was controlling the upper body, . . . the officer . . . used whatever technique he felt he needed at that point to control the inmate so the rest of us could do what we needed to do." (*Id.* at 102.) Although he did not recall the use of a neck restraint, he believed that a neck restraint was an appropriate use of force in that circumstance, because the inmate was "clearly bigger than the rest of us and struggling viciously not to be restrained and [was] completely noncompliant." (*Id.* at 102.) At the time, the use of a neck restraint was approved by the DCSO. (*Id.* at 110.) Butler agreed, however, that it would not be appropriate to carry a shackled and handcuffed inmate by his chains, as that "would hurt him." (*Id.* at 112.) He also stated

that they did not carry Taylor by the chains of the handcuffs. They picked him up by his arms and legs and feet to carry him to the holding cell. (*Id.* at 111–12.) He testified that they carried him rather than allowing him to walk on his own, because that was the quickest and safest way to get him out of the housing unit. (*Id.* at 112.)

Butler also testified about the distinction between the use of force in response to an immediate threat, such as that posed by an inmate engaged in assaultive behavior, and the calculated use of force:

> [C]alculated is, okay, like . . . I tell you to do something, you refuse to do it. Now we've got to figure out how to get him out of here. . . . Get someone together to get him out of here. . . . Immediate, is just you and me; I tell you to do something, "I'm not doing it," and you come at me. That's immediate. I don't have time to go get anybody. I don't have time to talk to you. I've got to defend myself, and I've got to get you to comply. That's immediate.

(Doc. No. 99-2, Butler Dep. 36–37.)

## III. STANDARD OF REVIEW

Summary judgment is appropriate where there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). "By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986). In other words, even if genuine, a factual dispute that is irrelevant or unnecessary under applicable law is of no value in defeating a motion for summary judgment. On the other hand, "summary judgment will not lie if the dispute about a material fact is 'genuine.'" *Id.*

"[A] fact is 'material' within the meaning of Rule 56(a) if the dispute over it might affect the outcome of the lawsuit under the governing law." *O'Donnell v. City of Cleveland*, 838 F.3d 718, 725 (6th Cir. 2016) (citing *Anderson*, 477 U.S. at 248). A dispute is "genuine" "if the evidence

is such that a reasonable jury could return a verdict for the non-moving party." *Peeples v. City of Detroit*, 891 F.3d 622, 630 (6th Cir. 2018).

The party bringing the summary judgment motion has the initial burden of identifying portions of the record—including, *inter alia*, depositions, documents, affidavits, or declarations— that it believes demonstrate the absence of a genuine dispute over material facts. *Pittman v. Experian Info. Sols., Inc.*, 901 F.3d 619, 627–28 (6th Cir. 2018); Fed. R. Civ. P. 56(c)(1)(A). The non-moving party must set forth specific facts showing that there is a genuine issue for trial. *Pittman*, 901 F.3d at 628. The court must view the facts and draw all reasonable inferences in favor of the non-moving party. *Id.* Credibility judgments and weighing of evidence are improper. *Hostettler v. Coll. of Wooster*, 895 F.3d 844, 852 (6th Cir. 2018).

"When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007). However, "[f]acts that are not blatantly contradicted by [a video] recording remain entitled to an interpretation most favorable to the non-moving party." *Coble v. City of White House*, 634 F.3d 865, 870 (6th Cir. 2011).

## IV.    ANALYSIS

### A.    Legal Standards

#### 1.    *Qualified Immunity*

Qualified immunity shields government officials in the performance of discretionary functions from standing trial for civil liability unless their actions violate clearly established rights. *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). A plaintiff who brings a § 1983 action against such an official bears the burden of overcoming the qualified immunity defense. *Quigley v. Tuong Vinh Thai*, 707 F.3d 675, 681 (6th Cir. 2013). At the summary judgment stage, the plaintiff must

show that (1) the defendant violated a constitutional right and (2) that right was clearly established at the time. *Id.* at 680. To do so, the plaintiff must, at a minimum, offer sufficient evidence to create a "genuine issue of fact" as to both prongs of the analysis, that is, "evidence on which [a] jury could reasonably find for the plaintiff." *Anderson*, 477 U.S. at 252, 256. "Put another way, if the district court determines that the plaintiff's evidence would reasonably support a jury's finding that the defendant violated a clearly established right, the court must deny summary judgment." *DiLuzio v. Vill. of Yorkville*, 796 F.3d 604, 609 (6th Cir. 2015). The court may evaluate either prong first—whether a constitutional right was violated or whether that right was clearly established at the time. *Pearson v. Callahan*, 555 U.S. 223, 227 (2009).

## 2. Excessive Force Under the Eighth Amendment

A prisoner's right to be free from the use of excessive force by a prison official is governed by the Eighth Amendment. *Whitley v. Albers*, 475 U.S. 312, 327 (1986). "To make out a claim under the Eighth Amendment, the prisoner must satisfy both an objective and a subjective component." *Williams v. Curtin*, 631 F.3d 380, 383 (6th Cir. 2011). "The subjective component focuses on the state of mind of the prison officials. The relevant inquiry is 'whether force was applied in a good faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm.'" *Id.* (quoting *Hudson v. McMillian*, 503 U.S. 1, 6, (1992)). In assessing this component, courts may consider "the need for the application of force, the relationship between the need and the amount of force that was used, and the extent of injury inflicted," as well as the circumstances "as reasonably perceived by the responsible officials on the basis of the facts known to them, and any efforts made to temper the severity of a forceful response." *Whitley*, 475 U.S. at 321.

The objective component requires the pain inflicted to be "sufficiently serious." *Wilson v. Seiter*, 501 U.S. 294, 298 (1991). "While the extent of a prisoner's injury may help determine the

amount of force used by the prison official, it is not dispositive of whether an Eighth Amendment violation has occurred." *Cordell v. McKinney*, 759 F.3d 573, 580–81 (6th Cir. 2014). "When prison officials maliciously and sadistically use force to cause harm, contemporary standards of decency always are violated . . . whether or not significant injury is evident." *Hudson*, 503 U.S. at 9 (citing *Whitley*, 475 U.S. at 327). "Otherwise, the Eighth Amendment would permit any physical punishment, no matter how diabolic or inhuman, inflicting less than some arbitrary quantity of injury." *Id.* The absence of a serious injury is nonetheless relevant as a factor that suggests whether the use of force may "plausibly have been thought necessary" in a given situation. *Id.* (quoting *Whitley*, 475 U.S. at 321). In this case, the defendants do not dispute that the objective component is met for purposes of summary judgment. (*See* Doc. No. 35, at 6.)

### B. Carrying the Plaintiff "Like a Rag Doll"

The plaintiff claims that the officers were unnecessarily rough in carrying him out of the housing unit after he had been handcuffed and leg-ironed, resulting in pain and injury to his wrist and hand. (Doc. No. 1, at 5–6.) In his deposition, Taylor insisted that the officers picked him up by the restraints themselves, "just by the chains," and "dragged [him] out of the cell." (Doc. No. 94-8, Taylor Dep. 29.) In his Supplemental Memorandum, the plaintiff argues that all of the defendants participated in carrying Taylor out of the housing unit and that none is entitled to qualified immunity with respect to this action, because a "reasonable jury could find that the way [they] carried Taylor from the cell was malicious and intended to cause harm." (Doc. No. 93, at 23.)

Lt. Butler testified as to his reasoning for carrying the plaintiff rather than allowing him to try to walk out—that the plaintiff, thus restrained, would not have been able to catch himself if he fell or protect himself if attacked by other inmates and that carrying him out of the housing unit was the fastest and safest way to move him. Moreover, contrary to the plaintiff's allegations, the

video of the removal does not show that the officers were unnecessarily rough in carrying him or in placing him on the floor on his side once they were outside the housing unit, or in picking him up again to move him into the holding cell, where he was placed on a bench, so that he could receive medical treatment following the application of the chemical spray. The video contradicts the plaintiff's assertion that he was carried by his restraints or slung around like a "rag doll."

While it is unfortunate that the plaintiff's wrist and hand were injured during the extraction, that fact alone does not establish the use of excessive force. There is simply no evidence to support the plaintiff's assertion that the way he was carried qualifies as a use of force at all, much less that it was a malicious and sadistic application of force applied "for the very purpose of causing harm." *Hudson*, 503 U.S. at 6. Nor has the plaintiff shown that it was clearly established at the time of the incident that carrying an inmate by his limbs, face down, constituted an excessive use of force in violation of the Eighth Amendment. The plaintiff, in fact, cites no authority at all suggesting a constitutional violation under similar circumstances. Insofar as the plaintiff's Eighth Amendment claim is premised upon the method by which he was carried out of the housing unit, all of the defendants are entitled to qualified immunity as to that part of the claim.

### C. The Use of Chemical Spray

The law is clear that corrections officers do not violate a prisoner's Eighth Amendment rights when they use force "in a good-faith effort to maintain or restore discipline." *Roberson v. Torres*, 770 F.3d 398, 406 (6th Cir. 2014) (quoting *Jennings v. Mitchell*, 93 F. App'x 723, 725 (6th Cir. 2004)). Accordingly, the Sixth Circuit has found no Eighth Amendment violation in numerous cases involving "the use of . . . chemical agents against recalcitrant prisoners." *Id.* (quoting *Caldwell v. Moore*, 968 F.2d 595, 600 (6th Cir. 1992) (collecting cases)); *Jennings*, 93 F. App'x at 725 ("The videotape squarely demonstrates that Jennings disobeyed repeated direct orders prior to the use of pepper spray."). Courts from other jurisdictions are in accord. *See, e.g.*, *Soto v. Dickey*,

744 F.2d 1260, 1267 (7th Cir. 1984) ("When an order is given to an inmate there are only so many choices available to the correctional officer. If it is an order that requires action by the institution, and the inmate cannot be persuaded to obey the order, some means must be used to compel compliance, such as a chemical agent or physical force."); *Lewis v. White*, No. CIV.A.1:07-0348, 2010 WL 2671495, at *3 (S.D.W. Va. June 8, 2010) ("The undersigned finds that it is clear that Plaintiff cannot satisfy the subjective component of the excessive force analysis. Although Plaintiff alleges that he was merely asking Defendant White a question, his actions demonstrate that he twice refused to obey a direct order. . . . It is widely recognized that prison guards may use chemical sprays when reasonably necessary to subdue an insubordinate prisoner because orders must be obeyed, and there are only so many choices available to correctional officers when an inmate refuses." (collecting cases)), *report and recommendation adopted*, No. CIV.A.1:07-0348, 2010 WL 2671570 (S.D.W. Va. July 1, 2010). *But see Williams v. Curtin*, 631 F.3d 380, 384 (6th Cir. 2011) (finding that the plaintiff stated a valid Eighth Amendment claim when he "allege[d] that, when instructed to 'pack up,' he inquired, 'What for, sir?,' at which point an 'assault team' entered the cell and used a chemical agent on him").

In this case, Taylor acknowledges that the defendants' compliance or failure to comply with the DCSO's Use of Force Policy is not dispositive of whether the defendants violated Taylor's constitutional rights, but he argues that the Use of Force Policy is "relevant" to the issue, insofar as it sheds light on the defendants' "subjective intent" in the exertion of force in excess of the departmental guidelines. He argues that, under the tiers set forth in the model, showing "different levels of threat and possible responses," the use of a chemical agent is a "Level IV" response, which "correspond[s] under the policy to inmates exhibiting 'assaultive' behavior that 'displays intent to harm the officer or another person.'" (Doc. No. 93, at 6–7 (quoting Use of Force Policy,

Doc. No. 94-1, at 6).)

The court finds the Use of Force Policy relevant, but not for the same reasons as the plaintiff

does. The plaintiff summarizes the Use of Force "tiers" as follows:

| Perceived Behavior | Reasonable Officer's Response | Enforcement Electives |
|---|---|---|
| **1. Compliance** – The subject responds as ordered. | **1. Cooperative controls** – Use of routine supervision and communication skills to gain the individual's acceptance of authority. Simply asking an individual to do something involves the use of cooperative controls. | **Level I** – Basic communication and operation skills and techniques that are normally effective with cooperating individuals. |
| **2. Passive resistance** – The subject ignores, or is not complying with, the officer's commands and is uncooperative, but is taking only minimal physical action to prevent the officer from gaining control and/or compliance. | **2. Containment techniques** – The purpose is to stabilize and prevent escalation of an encounter. Contact is made with the individual, usually verbally, although it may be written. Giving a direct order to an individual is an example of the use of a containment technique. Warnings, informal resolution of disciplinary issues, and incident reports are other examples. | **Level II** – Individuals are controlled through the use of certain words, tone of voice, and body language. |
| **3. Active resistance** – The subject's verbal or physical actions appear intended to prevent an officer from controlling the subject, but are not directed at harming the officer. | **3. Compliance techniques** – Stabilization of an incident. At this point assistance is needed. It is not a situation the officer should attempt to handle by himself. The confrontational avoidance process or a show of force by bringing in additional officers is an example of the use of compliance techniques. | **Level III** – At this level, individuals are controlled through a request for additional officers, or a show of force. |

| 4. Assaultive/bodily harm – The subject's behavior displays intent to harm the officer or another person, and prevent the officer from gaining control. | 4. Controlling/defensive tactics – Steps must be taken for self-preservation or protection of other employees. *The use of chemical agents, a forced cell move, and the use of subject control techniques are examples of controlling/defensive tactics*. | Level IV – Personal defense tools, chemical agents, impact weapons, and various team tactics may be appropriate at this level. |
| --- | --- | --- |
| 5. Deadly threat – The subject's actions are likely to result in death or serious bodily injury to the officer or another. | 5. Deadly force – Absolute and immediate tactics that must be deployed to stop a lethal threat. Use of a firearm is an example of the application of lethal force. | Level V – Firearms may be used. |

(Doc. No. 93, at 11–12.)

     The defendant officers here uniformly testified that there is a distinction between a calculated use of force and an immediate use of force. The former is at issue in this case, which involved a situation in which an inmate was repeatedly given a direct order with which he failed to comply. The plaintiff insists that he was complying, or at least that he was not "assaultive," as he had sat up on his bunk and calmly asked where the officers were taking him. That is not strictly true, however. The evidence in this case establishes that Officer Steen attempted to gain Taylor's cooperation in moving to the safe room by communicating with him verbally, repeatedly. On his fifth attempt, he brought another officer with him, which still did not have the effect of moving Taylor. Based on the model above, it is clear that Steen went through Levels I and II on his own. Bringing in Officer Rodgers to assist him constitutes a minor show of force, the Level III compliance technique identified above, in an additional attempt to gain Taylor's voluntary compliance. When this effort did not work, Steen went to Butler, who assembled a team of five officers, including himself and Rodgers. The team approached Taylor on his bunk. The presence of the extraction team clearly qualified as a "show of force" in an attempt to gain Taylor's

compliance with the directive that he get up for transfer to the safe room.

The video demonstrates that, before the officers engaged in any use of force, Taylor had been told two or three times where he was going, not counting his previous conversations with Steen. He knew where the officers were taking him. And he had been ordered at least five times to stand up but had not done so. At that juncture, if the officers were going to move Taylor, there was apparently no other way to do it other than by some application of force. It is quite clear that the chemical spray, applied in a single brief burst, was used "in a good-faith effort to maintain or restore discipline." *Roberson*, 770 F.3d at 406. Contrary to the plaintiff's assertion (*see* Doc. No. 93, at 14), the use of a chemical spray to gain Taylor's compliance with a direct order with which he had failed to comply for more than thirty seconds was not in violation of the DCSO's Use of Force Policy. More to the point, there is no evidence to support a conclusion that the spray was applied "maliciously and sadistically for the very purpose of causing harm," *Hudson*, 503 U.S. at 6; *accord Jennings*, 93 F. App'x at 725; *Soto*, 744 F.2d at 1267; *Lewis*, 2010 WL 2671495, at *3.

Insofar as the plaintiff claims that he was in the process of complying with the officers' directive, having at least sat up, the video reflects that it took Taylor 25 seconds simply to sit up and put his feet on the floor. The officers had no obligation to give him additional time to comply with the order to stand up. *Accord Jennings v. Peiffer*, 110 F. App'x 643, 645 (6th Cir. 2004) (finding no Eighth Amendment violation when an officer sprayed an inmate who defied a directive to remove his shoes, even though the inmate had removed one of his shoes by the time the officer sprayed him, as "Jennings ultimately may have attempted to obey the order by taking off one of his shoes, but Peiffer was not required to wait and see if Jennings would have a change of heart"). Although it arguably might have been preferable to allow the plaintiff additional time to comply or to give him an express warning that he would be sprayed if he did not comply, neither of these

was required by the Constitution.

The use of chemical spray in this case did not amount to the use of excessive force, and all defendants are entitled to qualified immunity with respect to the plaintiff's claim premised upon the application of chemical spray.

### D.     The Use of a Neck Restraint

#### 1.     LeMaster's Potential Liability

The video reflects that, as soon as the officers took hold of the plaintiff's arms for the purpose of restraining him, telling him to get on the ground, the plaintiff resisted, and the officers ended up tussling with him on his bunk, with LeMaster underneath him. LeMaster restrained the plaintiff at that point, as described above, with one arm around his neck and the other under his right arm, with his hands clasped together. The view of LeMaster on the video, however, is largely obscured by the other officers. By the time the officers moved Taylor to the floor, it is impossible to see on the video any part of LeMaster other than his feet and legs. And, based on the angle of his feet and legs, he appears to be putting a substantial amount of his weight onto the plaintiff's upper body (shoulders, neck or head). The plaintiff alleges that LeMaster told him at one point, "I'm going to break your fucking neck," and then proceeded to apply so much pressure that the plaintiff blacked out. (Doc. No. 98-8, Taylor Dep. 28, 46.) LeMaster denies, or at least does not recall, making such a statement and also did not believe that the plaintiff lost consciousness. (Doc. No. 94-3, LeMaster Dep. 108.) The other officers did not recall hearing LeMaster make that statement, nor were they aware that the plaintiff lost consciousness. (Doc. No. 94-4, Steen Dep. 120–21; Doc. No. 94-5, Voyles Dep. 79–80, 109). However, because the plaintiff was face-down, the view of LeMaster is blocked for much of the video, and the audio is not perfectly clear, the video neither substantiates nor refutes the plaintiff's version of events. Consequently, there are material factual disputes as to what exactly transpired between Taylor and LeMaster and whether

the plaintiff lost consciousness.

If a jury believes the plaintiff's version of events—that LeMaster told him he was going to "break his fucking neck" and applied the neck restraint, even after the plaintiff had been moved to the floor and was no longer struggling, with such force that the plaintiff lost consciousness—then a reasonable jury could also conclude that LeMaster applied force "maliciously and sadistically for the very purpose of causing harm," *Hudson*, 503 U.S. at 6, and that the force used was objectively in excess of that needed under the circumstances. Because the plaintiff has, and had, a clearly established right to be free from the use of excessive force and, in particular, from the use of force applied maliciously for the purpose of causing harm, LeMaster is not entitled to summary judgment on qualified immunity grounds as to this portion of the plaintiff's claim. *See Kulpa for Est. of Kulpa v. Cantea*, 708 F. App'x 846, 853 (6th Cir. 2017) (noting that it was "clearly established that the 'amount of force that was used' must be roughly proportionate to the 'need for the application of force'" (quoting *Cordell*, 759 F.3d at 581)).

### 2. The Other Officers' Potential Liability

The plaintiff also argues that a reasonable jury could find the other officers liable for LeMaster's use of excessive force. Regarding Butler, the plaintiff argues that Butler is liable "either for knowingly acquiescing in his supervisory role to Officer LeMaster's unconstitutional placement of a neck restraint" or "failing to intervene in his role as a fellow officer." (Doc. No. 93, at 22; *see id.* at 23 ("Taking the facts in the light most favorable to Taylor, Lieutenant Butler was in immediate proximity to Officer LeMaster, was an active participant in using force against Taylor, and would have had a view of Officer LeMaster applying the neck restraint to Taylor.").)[6]

---

[6] The plaintiff also argues that a jury could find that Butler's "troubling testimony"—that "he would have considered applying a neck restraint to the point of an inmate losing consciousness to be 'appropriate'" if, for instance "the inmate was extremely combative"—constitutes "evidence of a lack of good faith and an indication of a malicious intent to harm inmates like Taylor with the

Regarding Steen and Voyles, the plaintiff similarly argues that they were "in immediate proximity to Officer LeMaster" or "within arm's-reach," saw him apply a neck restraint, but made no attempt "to get Officer LeMaster to release the neck restraint." (*Id.* at 24, 26).

Section 1983 liability cannot be premised on a theory of *respondeat superior*, but supervisor liability under § 1983 is appropriate when "the supervisor encouraged the specific incident of misconduct or in some other way directly participated in it," or "at least implicitly authorized, approved or knowingly acquiesced in the unconstitutional conduct of the offending subordinate." *Leary v. Daeschner*, 349 F.3d 888, 903 (6th Cir. 2003) (quoting *Bellamy v. Bradley*, 729 F.2d 416, 421 (6th Cir. 1984)). In addition, a non-supervisory police officer may be "liable for failure to intervene during the application of excessive force when: '(1) the officer observed or had reason to know that excessive force would be or was being used; and (2) the officer had both the opportunity and the means to prevent the harm from occurring.'" *Goodwin v. City of Painesville*, 781 F.3d 314, 328 (6th Cir. 2015) (quoting *Turner v. Scott*, 119 F.3d 425, 429 (6th Cir. 1997)). The Sixth Circuit has "repeatedly denied qualified immunity when officers observe the use of excessive force yet fail to intercede." *Kulpa*, 708 F. App'x at 854 (citing *Ortiz ex rel. Ortiz v. Kazimer*, 811 F.3d 848, 853 (6th Cir. 2016) (denying immunity when the officer "directly observed at least some of the excessive force and had the ability and opportunity to stop it"); *Kent v. Oakland Cty.*, 810 F.3d 384, 397 (6th Cir. 2016); *Goodwin*, 781 F.3d at 328–29).

In this case, Butler testified that he did not instruct any of the officers on the extraction

---

use of neck restraints." (Doc. No. 93, at 19 (quoting Butler Dep. 29).) The court does not find this statement to be evidence of anything. Butler did not state that he was condoning such a use of force in this instance. Moreover, he also confirmed that, if he became aware that an inmate had lost consciousness during a neck restraint, he would instruct the officer holding the restraint to release it. (Butler Dep. 30 ("If I see it and the inmate is no longer combative, yes, I would tell him to stop.").)

team to use a neck restraint, and he did not actually recall anyone using a neck restraint. (Butler Dep. 101–02.) He testified that, during a physical alteration, "it's up to the officer's perception on what type of force he or she needs to use." (*Id.* at 102.) He also stated that use of a neck restraint was not inappropriate under the circumstances and that "whoever was controlling the upper body . . . used whatever technique he felt he needed at that point to control the inmate so the rest of us could do what we needed to do." (*Id.*) And, although Butler did not recall seeing any of the officers using a neck restraint, the video indicates that he would have been able to see LeMaster using a neck restraint for at least a part of the time during which the officers were wrestling with Taylor on his bunk. Likewise, it is at least arguable, based on the video, that Steen and Voyles would have been able to see that LeMaster was holding Taylor in a neck restraint while Taylor was still on his bunk.

Nothing about the situation at that time, however, would have provided any basis for believing that LeMaster was using excessive force, and certainly not such an obviously excessive use of force that the other officers should have intervened. Taylor was still struggling, the officers did not have control of him, and there is no evidence in the record that any of them heard LeMaster tell Taylor that he would break his neck. Because Taylor was still struggling, there was no reason for any officer to believe that Taylor was unconscious. Nor has Taylor alleged that he made any attempt to alert the officers that he was unable to breathe, was in pain, or was being restrained too tightly.

Further, by the time the officers moved Taylor to the floor, Butler had his back to LeMaster; Steen was at Taylor's feet with Voyles and Butler blocking his view of LeMaster; and Voyles was entirely focused on finishing placing the handcuffs and then leg irons on Taylor. The video shows that all three of these officers were focused entirely on securing Taylor and had no reason to

suspect that LeMaster was engaged in a use of excessive force. Even before Voyles finished with the leg irons and stood up, LeMaster had released his hold on Taylor and had also stood up. That is, no reasonable jury viewing the video could conclude that any of the officers "observed or had reason to know" that LeMaster was engaged in the use of excessive force. *Goodwin*, 781 F.3d at 328. Specifically regarding Butler, there is no evidence that he encouraged or participated in LeMaster's use of a neck restraint or that he "implicitly authorized, approved or knowingly acquiesced in" LeMaster's alleged used of excessive force. *Leary*, 349 F.3d at 903.

The court finds, based on the undisputed facts, that Butler, Steen, and Voyles are entitled to summary judgment on the grounds of qualified immunity, as the evidence establishes that they were not engaged in the alleged violation of the plaintiff's clearly established constitutional right to be free from the use of excessive force and that they neither observed nor had reason to know that LeMaster was exerting excessive force.

### E.    Exhaustion

The Sixth Circuit dismissed the defendants' appeal of Judge Parker's ruling that there was insufficient evidence to establish that Taylor had failed to properly exhaust his administrative remedies, but the appellate court also vacated the order denying summary judgment in its entirety, thus somewhat placing in limbo that portion of the ruling regarding exhaustion. To avoid any ambiguity, this court expressly adopts Judge Parker's ruling that material factual disputes preclude summary judgment on the basis of the plaintiff's alleged failure to exhaust his administrative remedies. (*See* Doc. No. 57, at 10 ("Defendants therefore do not meet their burden of demonstrating that Plaintiff failed to properly exhaust his administrative remedies. As a result, the Court rejects the magistrate judge's recommendation to dismiss Plaintiff's claims on exhaustion grounds."); *see also* Doc. No. 79, at 10 (denying Rule 60 motion).)

## V.    CONCLUSION

For the reasons set forth herein, the court will grant in part and deny in part the defendants'

Motion for Summary Judgment. An appropriate Order is filed herewith.

ALETA A. TRAUGER
United States District Judge